2196, 2197, 2313. Jeannie L. Somberg on behalf of Dylan S. Somberg v. Utica Community Schools. Arguments not to exceed 20 minutes per side. Mr. Lusk for the appellate, Cross Appellee. Good morning. We would like to reserve three minutes for rebuttal. Very well. And I'm going to focus my comments on cases 2195 and the related case. And there are two aspects of the case I would like to focus on. The District Court's decision on compensatory education and the effect of the parents' withdrawal of the student in October of 2015. As the Court is aware, this case is about one single IEP. In September of 2012, there were several claims made. They were all rejected except for three by the ALJ, the Administrative Law Judge. The Administrative Law Judge concluded that the goals and objectives were not IDEA compliant, that the transition plan was not IDEA compliant, and the District had not completed the promised evaluation of assistive technology. The ALJ also concluded that notwithstanding these faults, the student was not entitled to compensatory education, and that's where I plan to focus. There is not a dispute, as I can tell in the briefs, about the standard of proof or the burden of proof. The burden falls on the parent, and the parent is required to prove that the IDEA violations found by the ALJ caused the student to suffer an educational loss, and that compensatory education is necessary to remedy that loss. Are you sure that the burden of proof is on the parents with respect to compensatory education? Yes, sir, based on the Supreme Court's decision in Schieffer v. Lease. Tell us what's wrong with the 1200 hours that was decided by the District Court. Well, the District Court, there are several aspects to the argument, but the District Court permitted the parent to make a case that had not been made before the administrative law judgment. The District Court permitted the parent to say that during the four years preceding the September IEP, the District had miseducated the student, and there's a couple of problems there, Your Honor, that I've tried to tackle in my brief. Number one is a jurisdictional problem. The District Court's jurisdiction is limited to IEPs that have been challenged, and administrative exhaustion has occurred prior to the case coming to court. Now, there were four IEPs during that period of time, that four-year period of time, that the District Court was looking at, none of which had been appealed, and exhaustion had not occurred. The second issue with respect to what the District Court permitted had to do with the scope of additional evidence. And now there's no question that the judge has the ability and discretion to allow additional evidence, but there is a limit to that additional evidence. In this case, in this Court's case in Cook, for instance, the Court held that the District Court should not allow additional evidence to change the character of judicial review from a one-off review to a trial de novo. Otherwise, we undermine the due weight that the hearing officer and the record, administrative record, are owed. You could encourage sandbagging, people holding their best document of evidence until last, and encourage appeals. In other words, if I don't get what I'm looking for at the administrative hearing, I can try a new case before the District Court. Did you object to Judge Cleland at the time of the admission of this evidence? Yes, I did, Your Honor, and I objected to the point that, unfortunately, I frustrated Judge Cleland. It's a perilous thing to do. Yes, it was, Your Honor. I'll say that again. I wanted to preserve the record, and I objected. He's a great guy. He is a good guy. But he didn't take heavily to my argument on this point. Well, I mean, the finding was that Dillon was denied faith for that school year, 2012-2013. No, Your Honor, it wasn't. Actually, what the parent argued was that Dillon was denied faith from 2008 to 2012 under four IEPs that were never appealed through an ALJ or to the court. Now, how Judge Cleland got to $1,200, I really don't know. Well, wasn't there testimony from the plans expert that 1,200 hours was equivalent to one year? There was, but what the parent was asking for was for the four years, 2008 to 2012. And Judge Cleland said, no, that's too much. I'll give you one year. But there's no real rationale stated in his opinion for how he got from what the parent was asking for to what he ultimately concluded the student was due. If he had awarded 2,400 hours, you'd have really a strong case. I mean, it's tougher a little bit with 1,200, which is one year, right? Well, I think it would be the same case because what the parent is arguing for is 4,800 hours. And what Judge Cleland says without really any rationale is, I think that's too much. And I think one year is just right. And why one year as opposed to a year and a half? I don't know. Judge Cleland doesn't tell us. And the standard we have is what, abuse of discretion? Abuse of discretion on the factual finding to know, oh, I'm a legal review. What testimony was there from the experts as to the amount of time tutoring is necessary for conventional education? Well, as I recall, the expert for the parent, again, focusing on this period of time before the IEP that was under review four years prior to the IEP, takes the position, and Mr. Ayliff may be more accurate about this than not, that it would be about 4,800 hours of what he would have missed had he been, according to the expert, properly educated. Now, the expert has called for the district, says that there's no evidence. She looks at the psychometric data, his achievement and advancement in IQ scores, and says there's no evidence here of any kind of loss at all. He continues to make progress during these four years in the way that you would expect for a child with that type of disability. Was there any testimony from the expert that the school district proffered as to the amount of tutoring that would be appropriate for compensatory education? No, Your Honor, and I think that was the nub of the problem I confronted with Judge Cleland. I was arguing that the way we were going, we could not get to the issue of compensatory education, and he was asking me to tell him what compensatory education would be, which was the premise that I was arguing against. You said you made no proffer of evidence in the event that he lost. I did not. Okay. Your own expert said that even a single IBEA deviation could call for a student way off track. She did. It was a very leading question posed by Judge Cleland, but that must be considered in relation to the other evidence in the case. I mean, the other evidence in the case is that from the point that the hearing ended until October 2015, the district compiles or completes seven IEPs for the student, all of which have IBEA complying goals and objectives, etc. So now that's being a testimony, I would say to the court that there was no evidence that a time period went by where there were degrees that were being missed. I mean, the only thing that the hearing officer says we did wrong was to not be measurable enough in our goals and objectives, not have a transition plan. Like I said, the IEP required a 50-50 balance, didn't it, between special education courses and general population courses? I believe the IEP in question did in 2012. Right. In fact, only two of six were general education courses. And then the AOJ found, therefore, that the school district had violated the fate for this, that it didn't comply with the 50-50 balance. Well, there was a dispute between the parent and the district about what kind of classes the student should be in when he was not in academic classes. Two of them, though, turned out to be this education in the principal's office. Well, Your Honor, if I may, the ALJ holds that where the student should be when he's not in academic classes is in something called community-based instruction, which the parent was very much opposed to. She went to Mr. Monroe, the district's superintendent, who testified that he said, okay, if you don't want to be in CBI, like the hearing officer ultimately concluded, you can be in electives, but work goes out with the building principal. While they were trying to work these things out, Mrs. Somburg was asking for electives. The principal didn't think were appropriate. The principal was proposing electives. Mrs. Somburg didn't think it was appropriate. In the meantime, the student was working one-on-one with a paraprofessional in the office under the supervision of the building principal, who was also a special education teacher. It was a temporary thing. The difficulty was the time had passed where the school and Mrs. Somburg could not agree on what was an appropriate elective for Dylan to take. Now, this goes on a couple hours a day for several weeks. With respect to the unilateral withdrawal, referring to Fialca-Feldman, this court's decision, I think the rule is, and this is my characterization of what the court held, in an educational case, when a student leaves school with no intention to return, the case is moved. Here, the parent permanently withdrew the student in October 2015, and I think it's fairly clear, well, it's extremely clear, that the parent has no intention to return the student to the district. But isn't the relief that they're seeking basically retrospective in nature here? They want compensatory relief for deficiencies or violations that occurred in the past, in 2012, as opposed to let's comply going forward. That's a fair point, Your Honor. With this caveat, the award is not that the district provides service. Right. The award is that we pay for someone who provides service. Right. Because, I mean, I understand Judge Klee went to order, it's because of the acrimony here. Well. And that it was his judgment, his discretion, that the student would fare better if this were provided somewhere else. That was his judgment. Whether it was within the scope of his discretion, I dispute, Your Honor. Why? For two reasons. I mean, why would he have to force the student into an environment that he thinks is just a very unhealthy environment, based on what he's seen in the case? Well, the parent certainly was upset with the school district. There's no question about that. But that upset and that hostility was not reciprocated. Mr. Monroe testified, who the parent points to, he says, I think there's been some hostility in this case. And then the next question is, in this type of environment, this is Mr. Aliff, do you think Utica Community Schools could stay impartial and provide services to Dylan? And he answers, absolutely. I believe Utica has stayed impartial. What's your legal authority for the proposition that the district court was required to send him back to Utica Schools for this? Well, the statute talks about compensatory education. And that's education that's delivered by the district that violates the IDEA. What's your authority for that proposition? I mean, why does that mean the same district, in the event that the relationship is degraded to this point? I mean, Mr. Aliff was sued in this case, is that correct? Mr. Aliff was. I mean, that's pretty remarkable, isn't it? I mean, that would seem to be an indicia of true acrimony in the dispute here. A lawyer who brings the suit under the statute isn't himself sued for doing so? I've never seen that. I think it's fair to say that Judge Cleland thought so. As I've pointed out in our briefs, there have been, as of two years ago, at least 70 cases that are similar to this situation where a claim was brought, like the claim that was brought here. The school district not only sued the mother, the lawyer sued the mother herself, didn't they? The mother herself. Wasn't Mrs. Sonberg sued also, countersued? This is a totally different case that Mr. Aliff is referring to. This happened in 2006, or 2004 perhaps. And the court can take judicial notice, it's on the record. That case was not about, that was a case where the student had acted in a way that was dangerous to himself or others in his educational placement. And under the Supreme Court's decision in Honickman, the court, the district said, Your Honor, please change the student's placement unilaterally. Yes, Mrs. Sonberg was named as the party. We didn't name the student as the party, but the point was that he was in an unsafe environment, he needed to be in a safe environment, which Mrs. Sonberg eventually agreed to and the case was dismissed. That was long before this happened. And there were dozens of IDPs that were created between that time and the end of this case that provided the student with faith. In fact, Mrs. Kepke, who came in after the hearing, the record reflects that she undertook extreme efforts to bring Mrs. Sonberg around, to bring her back into the fold, to try and unruffle the feathers that had been ruffled. And on top of that, as the Michigan Department of Education held, the district did provide the student with a pre-appropriate public education for three years after this hearing occurred until the parent withdrew unilaterally. In fact, the MDE held that the district prepared an IEP for the student for 2016 in case he came back that also provided the student with a pre-appropriate public education. So even though the parent was hostile, even though there was some rough and tumble in this litigation, my point is that the record reflects that the district, with respect to the student, was always doing its job, except for one IEP in September of 2012, and my point about that IEP is the parent has not established what, if anything, the student lost as a result of those IEPs. The theory that the parent presented before the trial court was based on four years that were never considered by the administrative law judge, during which there were several IEPs that were never appealed and are presumed to have provided the student with faith. So that is the essence of the argument. All right. Thank you, Mr. Lusk, we'll hear a piece from you next. Good morning. May it please the court, my name is Rick Caleb, I'm here in behalf of Bill Somburg and the Somburgs who are athletes across Appalachians. As the court is aware, the Appalachian schools, which I would refer to as Utica, raises many issues on appeal, but I want to take the opportunity this morning to zero in on Utica's permanent defense of exhaustive administrative remedies in Appeal 172195, which I will refer to throughout as exhaustion. Exhaustion, of course, under the Individual with Disabilities Education Act, or IDEA, requires the party first exhaust administrative remedies prior to bringing it before a court of law. This court has taken an expansive view on the scope of that evidence that can be supplemented to the administrative record. Now, in this regard, Utica's exhaustion argument has absolutely no merit on appeal over the judgment in Record 30, where the district court ruled that my client, Dylan, was entitled to some measure of compensatory education. This is because that judgment was limited to the administrative record and the administrative record only, only the facts contained in the complete, undisputed, written administrative record stipulated by the parties to stipulate written stipulation signed as in the sealed administrative record. Only that was considered. Now, in that same judgment in Record 30, having determined my client was entitled to some measure of compensatory education, the district court then required further proceedings to determine the manner and amount of that competitive work. Those further proceedings were to be performed with trial, and about two to three months before that trial, the district court received additional evidence in the form of comparative testing, and it is this comparative testing that first gives rise to the exhaustion argument. Regarding this timing of the argument, I'll just spend a minute here. The excuse he gave for waiting until the last possible moment to raise it, I find ridiculous. It blames Sommers, claiming Sommers didn't spring this evidence on the eve of the trial. I actually had discussions with both Mr. Lusk and Mr. Krugman, counsel for Utica, during some of the negotiations about this, had to be six months prior. But regardless, on the record, Utica admits this evidence at least, if you knew of this evidence, at least as early as July 19, 2016, or 70 days before trial. Seventy days before trial. It's hardly anything before trial. Further, Utica didn't even finish the testing until September 23, 2013. It was so late, we were already five months into the district court proceedings. This is 11 months after it was required by statute, and eight months after the ALJ, or the Administrative Law Judge, required a new individual education plan that needed that testing. The district court's remark in Record 82, page 93387, indicates, or he says in that there, that in this case there has been delay and delay and delay, and I think that pretty much says it all. Utica never brought any motion as required. It never articulated anything remotely related to exhaustion that I could find anywhere in the record. In fact, I think it only mentions exhaustion twice, the word exhaustion twice, once in its affirmative defense, and once in closing arguments after proofs are closed. I mention this only because the timing of Utica's argument is more of what the district court referred to as questionable test litigation tactics, which we feel is nothing more than an attempt to further ask for an attorney's case. At the very least, it reveals Utica's continuing disdain to follow the spirit of any court director that doesn't want to. But regardless, the trial that later occurs, over two and a half days, results in another order in Record 90, awarding one year of combat, defined to be $1,200 including, and also one year of transition planning. Well, let me ask you one question about the court's award. As I understand it, the court finds a violation that occurred in September of 2012. Is that correct? Correct. And then it awards the 1,200 hours of remedial instruction or tutoring based upon that award. Is that accurate? And also one year of transition planning. Okay. And it seemed, maybe I'm misreading it, but it seemed like the court was basing that 1,200 hours in part on a decline, an academic decline that the court had found occurred from 2009, I think, to 2012. Is that accurate? I think that's accurate. And if I may, you'll have to continue. I think the judge, the district court judge, still arrived at the right conclusion. I guess, let me just tell you what my concern is just so you can speak to it as part of whatever you want to say. So I'm just, I'm trying to understand how an academic decline that precedes the award can be taken into account in crafting the remedy for that violation. Because we need two measuring points in order to determine whether or not this child regressed or not. And because of the malfeasance of Utica in conducting any testing whatsoever, you can grab that if you want, there is no other testing available. So we had to include, the only two points we have are November 2012, 2009 and September 2013. And that encompasses the period under review by the ALJ. So 2009, you're saying, establishes a baseline? Correct. How would that work, actually? I mean, obviously the student, you know, I mean, he's getting older, he's got more instruction, more time in school. So how would you measure the effect of a 2012 violation based upon where he was at 23 years before? Because IDEA mandates that there should never be regression or trivial advancement. And here we have over a four year period, regression or trivial advancement, all 23 categories tested. Ours should never be trivial advancement or regression, even over just one year. Okay, that's helpful. So, this testing that was supposed to be completed was wrongfully withheld. And like I mentioned, it's the only testing available. You can not only fail to do the required three year benchmark testing year in and year out, but it also failed to do required annual and periodic testing year after year since 2009, violating my client's right to a free and appropriate education or faith over and over and over. Stated another way, because of their malfeasance of doing any testing at all, there is no other testing available. And like I said, we need two measuring points. In addition to this, Utica bases its exhaustion argument on two false premises. First, they falsely claim that the ALJ's findings were limited to one year. That's not true. She made findings of significant educational deprivation spanning many years, as far back as 2005. Second, Utica bases its exhaustion argument on the false premise that, compared to the testing I think we just covered, this is from 2009-2012, and they're claiming that that's not a period under review by the ALJ. And that's true. That part's true. But the 2009-2012 part's not true. You just covered it in September. Testing was through September 2013, and it encompasses the specific year under review. Now, Utica would have... The 1,200 hours which your expert says is in effect one year, does that imply that Dillon received no educational advance at all during the 2012-2013 year under review? That's correct, because our expert testified that even though there was trivial advancement in some areas, that it really amounted to regression because a child learns anyway over a period of four years. You know, probably the district court didn't clearly articulate its rationale for how it came up with 1,200 hours in this IUD year question, did it? Yeah, well, in the record it was indicated that 1,200 hours approximates the number of hours in a school year, and so a position was taken that the entire school year was wasted. Is there any authority you have? I think Mr. Lusk was asking the same question about is there a law that says that this is the proper way to make the school district pay for tutoring as opposed to having the student come back to the school district to provide it? Well, I just think the general rule of the factory, Utica wants to force this child back into a hostile environment, and we have so many incidents... I understand, but I'm saying, so you can't cite me a case, though, that it's allowed or required the school district to pay for tutoring? There are some cases, but I can't say them offhand right now. I'm sorry. I think they are in that brief, though. But what I wanted to say next was that although there was trivial advancement and regression that took place in the first three years, or in all four years, Utica would have the district court believe that all of that occurred in the first three years and not in the fourth. There is no evidence presented in the trial to suggest this, and also that argument totally contradicts the findings of the ALJ. What were those findings? Well, she found that year after year, the year under review, there was absolutely no transition planning. She remarked that transition planning provides nothing. But if the ALJ found that, why did the ALJ not award any compensatory education? That's a good question. I find her opinion totally arbitrary. Her findings clearly indicate that there should be some type of compensatory education, and she just doesn't want any. And I don't get it. So that's why we appealed it. Even if you just take a social worker, the social worker testified that there was nothing in the file whatsoever. She couldn't even remember seeing my client the previous two weeks for the past three months, indicating that there was no social worker services at all. So it seems to me like there should be something to replace those required social workers. These social worker services were required in the IEP, and if we don't have some type of comp value that is always going to deny these services, then they'll never have any consequences. Same thing goes with transition planning. Same thing goes with the goals. She found that there were no measurable goals or benchmark goals in every single subject except one. She found a fake violation for that. The results of six weeks of wrongful seclusion and suspension, she had dedicated that as a violation of appropriate education. There's no behavior plan since 2005. There's no assistive technology assessment, even though the record shows assistive technology was already needed at least in the area of written expression since 2006. So I don't get where… I don't understand it. How old is Dylan now? He's 24. And we discussed this in our briefs, but with regard to irreparable harm was to add that although UTICA devotes significant time in its brief addressing the physiological issues we presented, it doesn't address the psychological arguments we raised. UTICA's own expert reports my client is still exhibiting anxiety over wrongful seclusion and restraints. UTICA's own assistant superintendent testified UTICA continues to be a hostile environment to the sophomores. UTICA's own expert testified that no child should ever be in a hostile environment. And another one of UTICA's own psychologists reports my client has clinically significant depression with anxiety and depression levels so high he can't even function with thoughts rising as bad as suicide with just an UCS teacher setting. Confirming what the parent felt all along is my client can't even function in a UTICA teacher setting. How in the world is he supposed to function through more administrative adversarial proceedings? So while there will be irreparable harm due to continuing physiological problems from what the district court record shows is a disease originating during high-stress administrative proceedings and for which the district record shows stress is a factor, there are also psychological problems here even more serious and UTICA doesn't address any of this. With regard to the intentional interference or infringement of procedural safeguards as an acceptance of exhaustion, the administrative record shows clearly that there is consistent failure by UTICA to comply with the act's requirements. It consistently ignores telephone calls, emails, and my client's educational power of attorney. It consistently refused to allow teachers to even talk to the parent. This is after the motion for parent involvement. We have to learn things for the first time by listening to testimony from the teachers. It refused to hand over a class schedule that the parent asks for two times, I ask for it four or five times. We actually have to get ALJ involved in this to get a schedule. It refused to share its supposed options of a team meeting when the parent is once again shut out. It refuses prior written notice of changes it's unilaterally making to the IEP causing more confusion and delay and it intentionally denies my client access to these records. We actually have to file a motion to gain access to these records. And once we finally are allowed, once UTICA finally acquiesces, UTICA staff is so busy with the new school year such that our access gets drawn out to October 10th, we're 156 days away. And then once we're finally allowed on school grounds to access these records, we find two sloppy mess boxes that clearly have been wiped through and they're missing all the testing since 2009. This is testing that UTICA is required to do, this is testing that UTICA intentionally withheld, and this is testing that UTICA intentionally delays in doing. Now, Mr. Luskin's constituent, Mr. Krugman, who worked this case together from the beginning, contrary to some of the pleadings I've been seeing, that Mr. Luskin somehow sprung into this as a new attorney. They are vintage attorneys and together they probably have some 65 plus years experience. What legal issue is this bearing on? Well, I want to show that there is a wrongful attempt to withhold the records and because of that, we feel there is an exception to the exhaustion requirement because it violated procedure safeguards. There is a pattern here. Could you make this argument for district court? No, I don't believe I did. Well, isn't it waived then? I mean, this is part of the prosecution, right? Let me think about this. Well, I think not because when we look at the congressional intent, and I have a case that is not in my brief, but I'd like to share with the court, I beg your indulgence for just a second, it's Heldman v. Solt, cited in 962S2-148, it's a Second Circuit case. And when you look at that case on page 159, quote, note 11, it discusses congressional intent and background and it defines more precisely the parameters of the futility exception in certain situations where it is inappropriate to require exhaustion and it lists four factors and we fall within those four factors. So, because of that, our argument is that the exhaustion exception applies regardless of whether or not we raised it earlier. Otherwise, what we're going to have is you continue to violate procedure safeguards, withholding of records, requiring a parent to obtain a due, or to, again, be involved in another expensive and costly due process hearing just to get records. Now, with regard to the abridging or the denial of these procedural rights, Congress mentions the word abridged, and in the second fact, Congress doesn't say anything about how the curtailment of procedure safeguards has to first be adjudicated a fate violation, which is what you did as advocates. The only requirement is that procedural rights work first, and this is definitely the case in this situation. There are other factors that I could run through, but I think I'm going to run out of time on that. Finally, in summarizing this exception, I know that Utica did nothing but warehouse my client for years and then tried to hire him, and when the parent gets wind of the enormity of the deprivation and tries to do something about it, they sue her without merit. And now it tries to insulate itself from this pattern of wrongdoing with the exhaustion. But for Utica's illegally withholding of his testing and records, either one of which would have received a timing or tipped us off to the scope of the deprivation, we could have easily amended the administrative complaint with a single sentence to improve more years. And with regard to raising it in the district court, we didn't raise it because Utica also didn't raise it. They waited until the last – Utica did not raise the exhaustion bill. They waited until the last possible moment in their third brief on appeal to raise it. So if they don't raise it, we don't raise it. Okay? I thank you for your time. Thank you. I appreciate your argument. Mr. Marks. Mr. Marks, and I'm sure you have, reviews the record. There is not a word in there about what problem has occurred educationally, what detriment has occurred, and what the nature of the compensatory education to remedy that is. Not a single word. I asked the parents' expert, what did you see in the administrative record that makes you think compensatory education is appropriate? He says nothing. There was nothing about it. I asked the same question of our expert who said the same thing. It just was not there. With respect to when I raised these issues, docket entry 72 in the district court, a couple of weeks perhaps before the evidentiary hearing, before the trial, is the very first time the parent indicates that they're going to try to make this case not about 2012, which was under review, but about this four-year period preceding 2012. I filed a motion in limine. I talked about it at the opening statement, at the closing statement during the course of the hearing. I was all over that because, as I pointed out to the judge, to this panel, there's a jurisdictional issue about exhaustion, and also an issue about the scope of additional evidence that should ever be permitted in an IDEA appeal. I won't repeat myself on that. I will say that Mr. Iliff has referred to a variety of procedural issues not pertinent to the case, most of which were dismissed by the administrative law judge before the case went to hearing. Thank you, Your Honors.